IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FIRST BANK CHICAGO F/K/A FIRST BANK OF HIGHLAND PARK,,<br>*Plaintiff*,<br><br>v.<br><br>AMERICAN ELECTRIC POWER SERVICE CORPORATION.<br>*Defendant*. | Case No.: 1:23-cv-00643 (MSN/WBP) |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant American Electric Power Service Corporation's ("AEPSC") Motion for Summary Judgment (ECF 65) and Plaintiff First Bank of Chicago's ("FBC") Motion for Summary Judgment (ECF 60).

### I. BACKGROUND[1]

FBC, as an assignee, seeks to recover unpaid funds from AEPSC pursuant to a hell-or-high-water clause in a payment agreement ("Payment Agreement"). AEPSC and IronNet executed a Master Agreement in which IronNet agreed to carry out a cybersecurity defense program in exchange for payment. AEPSC separately entered into the Payment Agreement with Asset Finance Group, Inc. ("AFG"), promising to make payments to them pursuant to a specified schedule. Meanwhile AFG provided IronNet with funds up front, a discounted amount of the total payments AEPSC owed to AFG under the Payment Agreement. AFG assigned the Payment Agreement to ePlus Group, Inc. ("ePlus"), which then sold it to FBC. Subsequently, AEPSC terminated the Master Agreement, and it ceased making payments. FBC claims to have been unaware of the

---

[1] The following facts are undisputed unless otherwise indicated.

1

Master Agreement that was executed between AEPSC and IronNet, which allowed AEPSC to terminate IronNet's services if certain conditions were met.

### A. Master Agreement

On May 9, 2017, AEPSC and IronNet entered into an agreement entitled "Master Agreement for IronDome Between IronNet Cybersecurity, Inc. and American Electric Power Service Corporation for the Energy Sector IronDome Project" ("Master Agreement"). Def. Statement of Undisputed Material Facts, ECF 66, ("SUMF") ¶ 1. Under the Master Agreement, IronNet agreed to provide certain equipment, software, and services in connection with AEPSC's participation in a nationwide cybersecurity project for electric utilities known as "IronDome." *Id.* ¶ 2. The actual equipment and services that IronNet would deliver to AEPSC for the IronDome project were to be more specifically defined in separate statements of work ("SOWs") negotiated between IronNet and AEPSC. *Id.* ¶ 3. The Master Agreement contemplated an initial term of five years with a right to renew until every SOW had expired, unless terminated earlier.

The Master Agreement granted AEPSC the right to terminate "for cause and for convenience." *Id.* ¶ 4. It also stated that "[a]ll invoices and payments will be issued in accordance with the SOW, subject to any terms or conditions specified therein." And the Master Agreement provided that "IronNet and AEPSC acknowledge that certain payments and obligations may be triggered only upon delivery and/or satisfactory completion of milestones as specified in the SOW." *Id.* ¶ 5.

### B. Statement of Work

Soon after the parties executed the Master Agreement, they agreed to the initial SOW on May 18, 2017. The SOW called for IronNet to supply cybersecurity sensor equipment, hardware, and software, and to provide maintenance and support services. It also set out a milestone schedule

over a five-year period, along with a payment schedule, for IronNet's provision of the equipment and services. *Id*. ¶¶ 6-7. Section 6.1 of the SOW states that "[p]ayments shall be made in accordance with a Payment Agreement in the form of Attachment 4." *Id*. ¶ 9. This form Payment Agreement is also referenced in the Master Agreement. *Id*. Section 6.2 of the SOW states that "[AEPSC] may withhold all or part of payment where permitted by this SOW or the [Master] Agreement." *Id*. ¶ 10. The SOW further provides that the terms of the Master Agreement will govern in the event of a conflict with the SOW. *Id*.

On May 26, 2017, AEPSC and AFG executed the first Payment Agreement in the form of Attachment 4 to the SOW. This Payment Agreement carries only IronNet's logo at the top, but the body of the agreement stated that it was between AEPSC and AFG. AEPSC never communicated with AFG, however; it only communicated with IronNet. *Id*. ¶ 11. The Payment Agreement further states that the "Product Supplier" was IronNet, and in Attachment A, it listed the same equipment, software, and services that IronNet was to provide to AEPSC under the initial SOW. The Payment Agreement required AEPSC to make two "Contract Payments" through AFG: (1) a payment of $3,785,000 due on June 2, 2017; and (2) a payment of $2,080,000 due on February 15, 2018. These were the same payments required by the SOW for years 1 and 2. The payments for years 3, 4, and 5 of the SOW were not referenced in the first Payment Agreement. *Id*. ¶ 12. AEPSC paid both amounts due under the first Payment Agreement to AFG for years 1 and 2, and it made the payments for years 3 and 4 of the initial SOW directly to IronNet. *Id*. ¶ 13.

### C. Change Order & Second Payment Agreement

Approximately three years after the initial SOW, in July 2020, AEPSC and IronNet entered into a Change Order to the initial SOW. The Change Order called for the replacement of some equipment, and it also set out a new project schedule requiring that IronNet deliver the new

3

equipment in 2021 with follow-on software enhancements, maintenance, and support each year from 2022 through 2025. It also stated that except as modified, all the other provisions of the initial SOW remained in full force and effect as originally written and constituted a legal, binding, and enforceable obligation from IronNet to AEPSC. *Id.* ¶ 14. The Change Order also included a new payment schedule for each of the five years of the SOW, encompassing years 2021 through 2025. *Id.* ¶ 15.

Like the initial SOW, the Change Order stated that "[p]ayments shall be made in accordance with a Payment Agreement in the form of Attachment 1 to this Change Order." *Id.* ¶ 16. That form Payment Agreement was identical to the first Payment Agreement except that (1) the "Product Description" in Attachment A was updated to reflect the deliverables IronNet was to provide under the Change Order and (2) the payment schedule was updated to mirror the Change Order's payment schedule for all five years. The second Payment Agreement was also branded with only IronNet's logo. *Id.* AEPSC and AFG executed the second Payment Agreement on July 25, 2020. *Id.* ¶ 17. During the first two years of the Change Order, 2021 and 2022, AEPSC paid AFG for the services and equipment provided by IronNet. *Id.* ¶ 18.

### D. Termination

By December 2022, AEPSC decided that the equipment and services IronNet was providing were no longer needed, and on December 20, 2022, AEPSC notified IronNet in writing that it was terminating the Master Agreement "including all Statements of Work existing thereunder," effective 30 days from the date of the notice in accordance with the terms of the Master Agreement. *Id.* ¶ 19. Following AEPSC's termination, IronNet provided no further equipment, software, or services to AEPSC. *Id.* ¶ 21.

### E. Procedural History

On July 28, 2020, AFG assigned all agreements between it and AEPSC to ePlus Group, Inc. ("ePlus"). ECF 1-4 at 5. On August 27, 2020, a Sales of Payments Agreement was executed between ePlus and First Bank of Highland Park, now known as FBC, whereby ePlus "agreed to sell, assign, transfer and set over to [FBC] all of its right, title and interest in and to the Contract,[2] but none of its obligations, and the right to receive Payments [] under the Contract[.]" ECF 1-5 at 1. FBC brought the instant action against AEPSC alleging a single count of breach of contract. It claims that AEPSC defaulted under the Payment Agreement by failing to make payments. ECF 1 ("Compl.") ¶ 23. AEPSC filed an answer and counterclaim seeking a declaration that it had not breached and did not owe any payments under the Payment Agreement to FBC. ECF 11 ("Answer & Countercl.") at 13. In its answer and counterclaim, AEPSC also asserted nine affirmative defenses against FBC's claims for relief.[3] *Id*. at ¶¶ 27-35. FBC moved to dismiss AEPSC's counterclaim and to strike AEPSC's affirmative defenses. ECF 19 ("Mot. to Dismiss"); ECF 21 ("Mot. to Strike.").

The Court denied FBC's Motion to Dismiss AEPSC's Counterclaim but struck two of the affirmative defenses --. fraud in the inducement and "mutual mistake. ECF 32 ("Order"). The Court otherwise denied the motion. *Id*.

After discovery, AEPSC and FBC filed cross-motions for summary judgment. ECF 60; ECF 65. The Court held oral argument on the motions, and they are now ripe for resolution.

---

[2] The August 27, 2020 Sale of Payments Agreement defined the "contract" as an Installment Payment Agreement between AEPSC and AFG. ECF 1-5 at 1.

[3] AEPSC's nine affirmative defenses include: 1) Lack of consideration; 2) unconscionability; 3) fraud in the inducement; 4) mutual mistake; 5) invalid assignment of payment agreement; 6) conditions precedent that were neither satisfied nor waived in the Master Agreement, SOW, or Change Order; 7) the fact that AEPSC made all the required payments under the Payment Agreement; 8) FBC not being a holder in due course; and 9) lack of mutual obligation. Answer & Countercl.

## II. LEGAL STANDARDS

When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to decide whether either of the parties deserve judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

## III. ANALYSIS

These motions turn on whether FBC may enforce the Payment Agreement against AEPSC after AEPSC terminated the Master Agreement, SOW, and Change Order with IronNet.

AEPSC argues that there is no genuine issue of material fact that the Payment Agreement does not, as FBC contends, "require AEPSC to continue paying FBC for goods and services AEPSC is no longer receiving." ECF 65 at 1. In its view, the Payment Agreement—irrespective of its language stating that it is "non-cancelable" and "unconditional"—cannot be read in insolation; rather the document must be read in the context of the Master Agreement and Change Order, under which AEPSC terminated the parties' obligations. And because AEPSC terminated those agreements, "it is as if the Payment Agreement, along with its hell-or-high-water and assignment clauses, ceased to exist." ECF 66 ("Def. Mot.") at 4. In other words, AEPSC's "payment obligations under the Payment Agreement are subject to the condition precedent that the Master Agreement and Change Order have not been terminated." *Id*. And because AEPSC terminated them, it argues it no longer has any payment obligations.

6

In response, FBC argues that AEPSC "is liable under the 2020 Payment Agreement" itself ECF 68 ("Pl. Opp.") at 1. It emphasizes that the "2020 Payment Agreement clearly states . . . that AEPS[C]'s payment obligations are unconditional and are without defense or setoff as to AFG's assignee, FBC." *Id*. at 2.

Because there is no genuine dispute that the Payment Agreement must be understood as one component of a larger transaction and agreement, it does not contain standalone enforceable provisions. In other words, after AEPSC terminated the Master Agreement, SOW, and Change Order pursuant to the terms in those agreements, it was no longer obligated to make the payments specified in the Payment Agreement. AEPSC is therefore entitled to summary judgment.

**A. The Payment Agreement should be construed in the context of the larger transaction.**

AEPSC argues that the "Payment Agreement must be interpreted together with the Master Agreement, SOW, and Change Order because these agreements are all part of the same transaction." Def. Mot. at 10. This is because, under Virginia law, "[w]here a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties; each document will be employed to ascertain the meaning intended to be expressed by the others." *Daugherty v. Diment*, 238 Va. 520, 524 (1989); *see also Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, 617 F. App'x 227, 236 (4th Cir. 2015) ("Where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject matter, they must be regarded as parts of one transaction, and receive the same construction as if their several provisions were in one and the same instrument.").

Virginia law "has taken a rather expansive view of what constitutes a single integrated contract." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 913 F.3d 409, 416 (4th Cir. 2019). Even "agreements not executed by the same parties may

7

nonetheless constitute an integrated contract" where "all the parties knew about the agreements and executed them at the same time as part of a single transaction to accomplish an agreed purpose" and "some of the agreements contain explicit references to the other agreements." *Id.* at 417 (quoting *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142, 152–53 (Va. 2001)).

The Supreme Court of Virginia considers five factors to determine if multiple agreements should be construed together: (1) whether the agreements were signed contemporaneously; (2) whether all the parties knew about the agreements; (3) whether the agreements were executed as part of a single transaction to accomplish an agreed purpose; (4) whether the agreements all had to be signed together or there would have been no deal; and (5) whether some of the agreements contain explicit references to the other agreements. *See Countryside Orthopaedics*, 261 Va. at 152–53. These factors all favor construing the Payment Agreement together with the Master Agreement, SOW, and Change Order.

### i. The agreements were signed contemporaneously.

The Payment Agreement and the Change Order were signed by Steve Swick on behalf of AEPSC as one document on July 25, 2020 at 10:02 a.m. ECF 66-2 at 4, 6. Although the Master Agreement, initial SOW, and initial Payment Agreement were not signed at the exact same time, execution of those initial agreements took place in a logical sequence and within a matter of a few weeks in May 2017.[4] The time gap therefore does not weigh against reading them together. *See Liberty Univ. v. Constr. Mgmt. Assocs.*, 2023 Va. Cir. LEXIS 58, *14–15 (Va. Cir. Ct. Apr. 11, 2023) ("Read together, these documents anticipate future projects supported by future documents, such as purchase orders, and that future purchase orders would be subject to and deemed to incorporate by reference the terms of the Master Purchase Agreement.").

---

[4] The Master Agreement for IronDome was signed on May 9, 2017 (ECF 66-1 at 2); the initial SOW on May 18, 2017 (ECF 66-4 at 7); and the initial Payment Agreement on May 26, 2017 (ECF 66-5 at 3).

### ii. All the parties were aware of the agreements.

In internal communications, AFG admits it was aware that AEPSC and IronNet had other agreements aside from the Payment Agreement.[5] AFG had also executed Payment Agreements with other utility companies in the IronDome project, pursuant to a "Teaming Agreement"[6] between AFG and IronNet, which contemplated similar arrangements. ECF 66-8. The Master Agreement between AEPSC and IronNet states on the first page that "IronNet intends to enter into similar master agreements with each of the other Founding Utilities, along with other members of the electricity industry, to enable a comprehensive cybersecurity defense program."[7] ECF 66-1 at 2. Moreover, these other agreements contained similar termination clauses. Accordingly, at the time AFG executed the Payment Agreement, it must have known that AEPSC had a Master Agreement and one or more SOWs.

### iii. The agreements were executed as part of a single transaction to accomplish an agreed purpose.

The Payment Agreement states that "[AEPSC] agrees to pay through Asset Finance Group, Inc. for the products listed below . . ." ECF 66-2 at 5. The "products listed below" as set forth in Attachment A of the Payment Agreement, are the same hardware, software, and services that were to be provided under the Change Order. *Id*. at 2. Furthermore, the payment schedule found in the

---

[5] Sharon Cipperly, an ePlus employee, responded to an e-mail from Mike Trimble and Marcela Menendez, both FBC employees, who asked – "Did we know about the IronNet MSA and SOW with AEP at the time of contracting?" To which, Ms. Cipperly answered – "We knew that IronNet had separate documentation (not the specifics), but that AFG's and AEP's agreement was separate and between AFG and AEP only. We did have a sales quote from IronNet that provided the numbers and bill of materials for the deal." *Id*. at 241.

[6] The Teaming Agreement, which was entered into on December 7, 2016, between IronNet and AFG defined IronNet as the "Vendor" that would provide "information technology equipment, software and related services to various commercial and government entities ('Customers')." The agreement further described IronNet as "desirous of connecting [Customers'] payment stream to leasing and financing programs related to them." The agreement also defined AFG as being "in the business of developing and implementing such type of arrangements for Vendors in these markets." Most importantly, it memorialized the working relationship between IronNet and AFG whereby both entities would work "together on [a] financing program . . . relating to payments from the Vendor's Customers" ECF 66-8 at 2.

[7] This language can also be found in the Master Agreement for IronDome between IronNet and Dominion Resources Services, Inc., another "founding utility." ECF 61-4 at 280.

Payment Agreement is identical to the one contained in the Change Order. *Id.* at 3, 5.

### iv. The agreements had to be signed together or there would have been no deal.

The Change Order explicitly calls for AEPSC to make its payments pursuant to the Payment Agreement. ECF 66-2 at 3.[8] It is only logical that the Change Order had to be executed with the Payment Agreement or else AEPSC would have promised to pay for the three items listed therein without a promise by IronNet to supply said items. *Id.* at 7. In other words, the Payment Agreement does not contain an obligation on either IronNet's or AFG's part. ECF 66-7 at 4; ECF 66-10 at 85-88. The only obligation set forth in the Payment Agreement is AEPSC's payment obligation. ECF 66-2.

"[T]o be binding and enforceable, a contract must be supported by consideration." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005). Although FBC argues that the Payment Agreement's terms should be understood as enforceable in isolation, the Payment Agreement was not supported by consideration. At various points FBC characterizes AFG as a "lender" and AEPSC as its "customer," but from the record before the Court, AEPSC does not appear to have received or requested a loan or financing from AEPSC. As FBC itself admits, "the clear purpose of the 2020 Payment Agreement was to allow AEPSC to pay over time, while allowing IronNet to receive funds upfront." Pl. Mot. at 26. Under the Payment Agreement, the only obligation fell on AEPSC to send its payments to AFG. When considered in isolation, AEPSC did not receive consideration for signing the Payment Agreement. Accordingly, the Payment Agreement cannot be construed without the other documents that made the deal an enforceable agreement.

### v. The agreements contained explicit references to each other.

Even though the phrases "Change Order" or "Master Agreement" do not appear in the Payment

---

[8] The Change Order contains the Payment Agreement as an attachment. ECF 66-2 at 5.

Agreement, the Payment Agreement is attached to and incorporated in the Change Order, just as the initial Payment Agreement was attached to and incorporated in the initial SOW. ECF 66-2 at 2-10; ECF 66-4 at 5-6. The Master Agreement also references the form for the Payment Agreement.[9] ECF 66-1 at 14. The Payment Agreement contains the same payment schedule and describes the same products and services as the Change Order. ECF 66-2 at 2-7. Lastly, the Payment Agreement is "co-branded" with IronNet's logo, which according to AFG's representative, was done as a marketing tool for IronNet's benefit. ECF 66-2; ECF 66-7 at 5-7. Given the amount of cross-referencing among these documents, this factor tilts in favor of finding that these documents should all be interpreted together.

For all these reasons, the Payment Agreement must be construed as one component of a larger agreement that consisted of the Master Agreement, SOW, and Change Order.

### B. The non-termination of the Master Agreement was a condition precedent to AEPSC's payment obligations.

When considering these documents together, it becomes as clear as it is logical that AEPSC does not have to make payments for services it declined pursuant to the agreement between the parties.

First, the Master Agreement expressly states that "certain payments and other obligations may be triggered only upon delivery and/or satisfactory completion of milestones as specified in the SOW." ECF 66-1 at 5. In a provision incorporated by reference in the Change Order, the initial SOW states that "[AEPSC] may withhold all or part of payment where permitted by this SOW or the Agreement." ECF 66-4 at 6. And the Change Order states that "[e]xcept as modified by this Change Order and prior Change Orders, all other provisions of the original SOW remain in full

---

[9] In Section X, Part G entitled "Payment Agreements," it states that "[f]or the avoidance of doubt, Attachment 4 to SOW 029219770001x103 represents the form of payment agreement to which this provision shall apply."

11

force and effect as originally written and constitute the legal, valid, binding, enforceable obligation of Supplier to Company." ECF 66-2 at 4.

Second, AEPSC had the right to terminate the Master Agreement and Change Order for its convenience without being obligated to continue payments. The Master Agreement provided that "AEPS[C], in its sole discretion, may terminate this Agreement or any SOW, in whole or in part, at any time, without cause, by providing at least thirty (30) days' prior written notice to IronNet specifying the extent to which the Agreement or any SOW is terminated and the date, immediately or otherwise, on which termination becomes effective . . . . AEPS[C]'s payment of the Termination Fee is its sole liability and entire obligation and IronNet's exclusive remedy for any termination by AEPS[C] under this Section." ECF 66-1 at 16-17.

Third, another provision incorporated in the Change Order from the initial SOW states that "[i]f a conflict arises between the [Master] Agreement and this SOW, the terms and conditions of the [Master] Agreement will govern." ECF 66-4 at 2. As an attachment to the Change Order, the Payment Agreement was a component of the Change Order, and if the terms conflicted, the Master Agreement would therefore govern. Moreover, "a specific provision of a contract governs over one that is more general in nature." *Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 573 (2011) (quoting *Plunkett v. Plunkett*, 271 Va. 162, 168 (2006)). The specific rights afforded by the Master Agreement, SOW, and Change Order, which uses tailored language to discuss each of the party's expectations and obligations therefore supersede the general obligations set forth in what seems to be boilerplate language in the Payment Agreement.

Putting this all together, when reading the Payment Agreement in conjunction with the Master Agreement, SOW, and Change Order, it becomes clear that AEPSC's payment obligations

were subject to the condition precedent that the Master Agreement and Change Order had not been terminated.

The circumstances here are similar to those in *IFC Credit Corp v. Burton Industries, Inc.*, 536 F.3d 610 (7th Cir. 2008), which involved a contract with a similar hell-or-high-water clause that purported to make a lessee's payment obligation unconditional, a merger clause purporting to exclude all other agreements from consideration, and an assignment clause purporting to limit the defenses the lessee could assert against an assignee of the lease. Def. Mot. at 16. Nonetheless, the Seventh Circuit held that when "different instruments are executed together as part of one transaction or agreement, they are to be read together and construed as constituting but a single instrument." 536 F.3d at 614. And "[b]y executing the Hardware Application, both [parties] clearly agreed to a condition precedent to the formation of the Equipment Rental Agreement: until the [equipment] was mounted in [lessee's] phone closet, neither party was bound by the Equipment Rental Agreement's terms. And because that condition never occurred, it was as if the Equipment Rental Agreement – along with its 'hell-or-high-water' and assignment clauses – never existed in the first place." *Id*. at 615 (cleaned up). So too here. By executing the Payment Agreement in conjunction with the Master Agreement, SOW, and Change Order, the parties "clearly agreed to a condition precedent" of the Payment Agreement: that the Master Agreement was still in effect.

FBC argues that *IFC Credit* is distinguishable because the Payment Agreement had existed and was in effect—as evidenced by AEPSC's payment for two years—unlike the Equipment Rental Agreement in *IFC Credit* that "never came into existence, because [the] equipment [was] never installed, as required under the terms of the hardware application" Pl. Opp. at 29. That is a distinction without a difference, however, because under the Master Agreement AEPSC retained

13

the right to stop equipment and services flowing from IronNet, which in turn nullifies the terms of the Payment Agreement.

After AEPSC terminated the Master Agreement and Change Order, it was no longer obligated to make payments pursuant to the Payment Agreement. "[W]hen a contract fails because a condition precedent cannot be met, the contract is null and void by operation of law." *Vega v. Chattan Assocs., Inc*., 246 Va. 196, 201 (1993). And this condition precedent remained following the assignment of the Payment Agreement to FBC because "Virginia law makes clear that an assignee of rights under a contract stands in the shoes of the assignor and can have no greater rights than the assignor would have had." *Historic Green Springs, Inc. v. Brandy Farm, Ltd*., 32 Va. Cir. 98, 103 (Va. Cir. Ct. 1993).

FBC focuses much of its briefing on arguing that it is a "holder in due course" under the UCC so that it can enforce the waiver of defenses clause in the Payment Agreement.[10] *See* Va. Code Ann. § 8.9A-403(b). But even assuming that is true, "the Condition Precedent acts not as a defense or counterclaim disclaimed by [AEPSC], but rather [it] automatically terminate[s] [AEPSC]'s obligations to [AFG] . . . . As a result, [AEPSC] had no obligation to [FBC]." *Gaia Leasing LLC v. Wendelta, Inc*., 2010 U.S. Dist. LEXIS 135887, *10–11 (D. Minn. Dec. 23, 2010).

---

[10] Paragraph 7 states the following: "**ASSIGNMENT**. You shall not sell, transfer, assign or otherwise encumber (collectively, "Transfer"), or sublease, this Contract in whole or in part. We may, without notice to You, Transfer Our rights and interests in and to the Contract Payments and this Contract, in whole or in part, to a third party (a "New Owner"), in which case the New Owner will have all of Our rights but none of Our obligations. You agree not to assert against the New Owner any claim, defense or offset You may have against Us." ECF 66-2 at 5.

## IV.     CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment[11] and deny Plaintiff's Motion for Summary Judgment in an order accompanying this memorandum opinion.

/s/
Hon. Michael S. Nachmanoff
United States District Judge

Alexandria, Virginia
May 8, 2024

---

[11] Defendant's Amended Answer and Counterclaim for Declaratory Relief (ECF 11) raises a claim for declaratory judgment under 28 U.S.C. §§ 2201–2202, seeking a declaration that AEPSC "has not breached and does not owe any payments or other moneys under the Payment Agreement at issue in this litigation." Countercl. at 13. AEPSC did not renew its request for declaratory judgment in its motion for summary judgment (ECF 65). Consequently, the declaratory relief initially sought is now moot as it will not "serve a useful purpose in clarifying and settling the legal relations in issue" *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998) because the issue of a breach as to the Payment Agreement has already been resolved before this Court.